# WILLIAM H. STOW

*v.*

## FRANCES ANN RUSSELL *et al.*

1. DEMURRER IN CHANCERY — *its office and effect, and what is admitted thereby.* A demurrer to a bill in chancery only admits that which is well stated or pleaded. It is always to the merits and in bar of the relief sought, and proceeds upon the ground, that, admitting the facts stated in the bill to be true, the complainant is not entitled to the relief he seeks. It is always founded upon some strong point of law, going to the absolute denial of the relief sought, but defects in substance are not supplied or aided by it, nor defective statements of title or claims to relief cured by it. It does not admit any matters of law which may be suggested in the bill, or inferred from the facts stated in it.

2. SAME — *and herein, in what good pleading consists.* Where a complainant in chancery, in seeking to avoid the effect of certain stipulations in a contract, makes a general statement that he was induced to enter into the contract by the statements and assurances of the agent of the other party, such a statement is not admitted by a demurrer to the bill, for the reason that no specific fact or facts are thereby charged of an improper character, or unworthy or disreputable means used, to induce the execution of the contract.

3. Nor is a general allegation in the bill that there were errors in computation of the amounts in reference to which the contract was made, admitted by a demurrer, because it is not well pleaded. In such an allegation there is nothing specific or tangible, which could be denied by answer. There being no fact stated, showing errors in the amount, or the extent of the errors, or any errors in the computation shown, nothing is distinctly and unequivocally asserted, demanding denial or answer.

4. CONTRACTS — CONSTRUCTION THEREOF — *whether a new contract, or in exten-*

*sion of a prior one.* Russell made a contract in writing, by which he agreed to sell to Stow, certain real estate, at a stipulated price, one thousand dollars of which was paid down, and the balance was to be paid in equal annual installments, with interest at six per cent. Some of these installments were paid, but a considerable portion of the amount remaining unpaid after it became due, another agreement was entered into, in writing, between the parties, stipulating for the sale of the premises. The first contract, it is inferred, contained no clause making time of the essence of the contract, nor did it provide for a forfeiture on default. The last contract contained both these features, and other most stringent stipulations, and contained not the slightest allusion or reference to any prior contract, nor the least intimation that it was designed as a revival, or as an extension of the original contract for any new purpose or for any new consideration. The price to be paid for the property was greater under the new, than under the old contract. It was held, the last agreement was a new contract, not an extension of the former one. If it had been intended to revive and extend the old contract, it is natural to suppose, some reference to it, or some intimation to that effect, would be found in the contract actually made.

5. SPECIFIC PERFORMANCE — *party asking it must not be in default.* A party cannot compel the specific performance of a contract in a court of equity, unless he shows that he himself has specifically performed all the acts which formed the consideration for the undertaking on the part of the defendant, or can justly account for his non-performance.

6. SPECIFIC PERFORMANCE — *where time is made essential.* It is true, as a general principle, in equity, that time is not material. But parties have a right to make the time of the performance of a contract material, and a court of equity has no power to enforce its specific performance contrary to the clearly expressed intentions of the parties. It is the duty of the courts to give effect to existing contracts, not to make new ones for parties.

7. SAME — *whether party in default as to time of performance may have relief.* Inevitable accidents might perhaps be ground for relief, even where time is made essential ; but where a purchaser of land has diverted the means which should have been applied to the payment of the purchase-money, to the erection of buildings upon other property, he cannot set up his losses in business and the destruction of his buildings by fire, as an excuse for not complying with his contract.

8. TIME OF THE ESSENCE OF A CONTRACT — *waiver thereof.* Where time in the payment of money is made of the essence of the contract, and money is paid after the day, and accepted, that is a waiver of the want of punctuality as to the particular day.

9. TENDER — *must be kept good — its effect.* A debtor is bound at all times to be prepared to meet a demand for money that he may have tendered. If a creditor refuses money tendered by a person having the right to make the tender, interest will cease to run from the time of the tender, especially if the debtor keeps the money continually ready, and makes no profit by it.

10.  SAME — *when not kept good, its effect on the right to a specific performance.* In a contract for the sale of land, where time in the payment of the purchase-money is made of the essence of the contract, if the purchaser tenders the money in proper time, and it is refused, he must have the money ready to meet any subsequent demand of the vendor, and if he fails therein, he will be regarded in default, and cannot have a specific performance.

11.  EJECTMENT — *defense therein, as between a vendor and purchaser of land.* The action of ejectment proceeds for the possession of the premises, claiming that they have been unlawfully entered into and unjustly withheld.   Facts which go to disprove these make a legal defense.

12.  So where a party has entered into possession of premises under a contract of purchase, making valuable improvements, paying the taxes, and exercising all the various acts of ownership over the property, and paying the amount contracted to be paid for it, or tendering the amount at the proper time, these facts may be proven, and amount to a legal defense, in an action of ejectment brought by the vendor to recover the possession from his vendee.

13.  JURISDICTION IN CHANCERY, *for specific performance, where the party has not availed himself of a defense at law.*   And it seems where the defendant in the ejectment suit, being in possession under such circumstances, neglects to assert his defense, and a judgment is recovered against him, he will·be precluded from afterwards resorting to a court of equity to compel a specific performance by his vendor.

14.  PARTIES — *only those whose rights are affected by irregularities can complain of them.*   A party cannot complain because the property of another person has been sold in discharge of his own debt.

15.  So where an execution has been levied upon land which the defendant in the execution held by purchase, but to which he had forfeited all right by reason of his *laches,* he cannot allege against any irregularities which might intervene in the seizure and sale under the execution.

16.  LANDLORD AND TENANT.   A tenant is bound to pay the stipulated rent, though the building is consumed by fire during his term.

WRIT OF ERROR to the Circuit Court of Cook county ; the Hon. GEORGE MANIERRE, Judge, presiding.

This was a suit in chancery instituted in the court below, by William H. Stow against the representatives of Samuel Russell, deceased, to compel the specific performance of a contract for the sale of certain real estate in the city of Chicago, entered into by said Russell, in his lifetime, with the complainant.   A demurrer was interposed to the bill, which was sustained and the bill dismissed.   The complainant brings the case to this court for review on writ of error.

The allegations in the bill are sufficiently set forth in the opinion of the court.

Mr. ARTHUR W. WINDETT, for the plaintiff in error, among other questions, insisted that a judgment in ejectment against a party in possession under a contract of purchase from the plaintiff in the action, did not operate to conclude such purchaser from a resort to a court of equity to compel a specific performance by his vendor.

*Ferguson* v. *Tallmadge*, 20 Ill. 599 ; *Clarke* v *Lyman*, 8 Vern. 290 ; *Winchester* v. *Gleaves*, 3 Hayw. 213 ; *Lane* v. *Belk*, 1 Iredell Ch. 163 ; *Haley* v. *Bennett*, 5 Porter, Ala. 452.

The counsel contended that the limit of the legal estoppel of· the judgment is furnished by the rule which prevents equitable rights from being set up, or put in issue on the trial at law.

*Pollock* v. *Gilbert*, 16 Geo. 398 ; *White* v. *Crew*, 16 Geo. 422 ; 1 Bailey, 122 ; 1 Bailey, 324 ; *Blanchard* v. *Pasteur*, 2 Hay. 393.

And that, in ejectment an equitable title or defense, such as possession under a contract for the sale of the land, will not be a bar to the recovery.

*Reed* v. *Reed*, 8 Term Rep. 118 ; Adams Eject. 32, 33 ; *Croekford* v. *Alexander*, 15 Ves. 138 ; *Joy* v. *Berdell*, 25 Ill. 541, 3 ; *Ferguson* v. *Tallmadge*, 20 Ill. 599 ; *Prentice* v. *Wilson*, 14 Ill. 93 ; *Reece* v. *Allen*, 5 Gil. 237, 41 ; *Agricultural Bank* v. *Rice*, 4 How. 225, 42 ; *Hickey* v. *Stewart*, 3 How. 761, 2 ; *Boone* v. *Chiles*, 10 Pet. 224, 5 ; *Holman* v. *Walkins*, 16 Pet. 35 ; *Sinclair* v. *Field*, 8 Cow. 543, *strong ; Anonymous*, 1 Hayw. N. C. 331, side page ; *McCurry* v. *Robinson*, 23 Geo. 321 ; *Pitts* v. *Bullard*, 3 Kelly, 5, 18 ; *Pollock* v. *Gilbert*, 16 Geo. 398 ; *Bogert* v. *Perry*, 17 John. 352 ; *Collins* v. *Robinson*, 33 Ala. 91 ; *Nickles* v. *Haskins*, 15 Ala. 619, 623 ; *Chapman* v. *Glassell*, 13 Ala. 50 ; *Ridgeley* v. *Britton*, 4 H. and W. H. 507 ; *Matthews* v. *Ward*, 10 G. and Johns. 443 ; *Haley* v. *Bennett*, 5 Porter, Ala. 452 ; *Clarke* v. *Lyman*, 8 Ver. 290, 4 ; *Arnold* v. *Grimes*, 2 Clarke, Iowa, 1 ; *Page* v. *Cole*, 6 Clarke, Iowa, 153.

The interest of a vendee in possession, under a contract of sale, being an equitable interest and not legal.

*Rutherford* v. *Green,* 2 Iredell Ch. 131; *Lafferty* v. *Whitesides,* 1 Swann Tenn. 123; *Linscott* v. *Beech,* 33 Maine, 530; *Crockford* v. *Alexander,* 15 Ves. 138; *Joy* v. *Berdell,* 25 Ill. 541, 543.

The relation is to a certain extent analagous to that of equitable mortgagor and mortgagee, and so with their rights and duties towards each other.

*Haley* v. *Bennett,* 5 Porter, 452; *Crawford* v. ———, Saxton, 458; *Smith* v. *Moore,* 26 Ill. 392, 3.

Messrs. Scammon, McCagg & Fuller, for the defendants in error, contended that a judgment in ejectment under the circumstances indicated, determines the rights of the purchaser, because until default was made in the performance of the conditions of the contract of purchase under which he entered, he was entitled to the possession of the premises. Citing *Prentice* v. *Wilson et al.,* 14 Ill. 91. And the party having his defense at law, and failing to assert it, cannot resort to equity to enforce the right involved in such defense. *Moore* v. *Bagley,* Breese, 94, and notes; *Ballance* v. *Loomis,* 22 Ill. 82; *Owens* v. *Ranstead,* id. 161; *Hopkins* v. *Lee,* 6 Wheat. 109.

Mr. Justice Breese delivered the opinion of the Court:

Samuel Russell, of Middletown, Connecticut, being the owner of lot nine, in block twenty-eight, in the original town of Chicago, "sometime in 1846 or 1847" made a contract in writing with the plaintiff, Stow, by which he agreed to sell to him this lot, for the sum of "six or seven thousand dollars." Of this sum one thousand dollars was paid down, and the balance was to be paid in equal annual installments, with interest at six per cent.

On the execution of the contract, the plaintiff took possession of the lot, and made valuable improvements on it at a cost of several thousand dollars, and for many years carried on a foundry on the lot, with the consent and approbation of Russell and his agents.

The installments due in 1847 and 1848, were paid by plaintiff, and about one-half the installment due in eighteen hundred and forty-nine; the balance for that year, and the installments for 1850 and 1851, were not paid.

In the summer of 1852, Russell pressed for payment, threatening a suit, or proceedings to terminate the contract. The payments were not met, whereupon, it is alleged, the time of payment was extended by Russell, on the terms that plaintiff should pay Ogden and Jones, the agents of Russell, one thousand dollars in hand, and that thereupon they should ascertain and make a statement to complainant of the amount of payments made, and of what remained to be paid, under the contract, both principal and interest, if any; that upon the amount so ascertained, plaintiff should pay interest at ten per cent. until it should be paid; that plaintiff might begin four months thereafter, by paying two hundred dollars of the unpaid balance, and so on, two hundred dollars a month, until all should be paid. The agreement actually made and concluded by the parties, signed and sealed by them, bears date August 2, 1852, and purports to be made at the request of the plaintiff. It shows, in consideration of the money to be paid and the covenants expressed in it, to be performed by the plaintiff, the prompt performance of which payments and covenants being a condition precedent, and time being of the essence of the condition, that Russell agreed to sell to the plaintiff lot nine, in block twenty-eight, and in consideration of the premises, the plaintiff agreed to pay the party of the first part, at the office of Ogden, Jones & Co., in Chicago, the sum of seven thousand two hundred and seventy-seven dollars and fifty cents, in certain monthly installments of two hundred dollars each, and seventy-seven and fifty one-hundredths dollars on the first day of December, 1855, the term of credit being about three years and four months.

Russell covenanted, that upon the faithful performance, by the plaintiff, of his undertakings, and of the payment of principal and interest of the sum stipulated, in the manner specified, he would, without delay, execute, acknowledge and de-

liver, in person, or by attorney, duly authorized, to the plaintiff in error, his heirs or assigns, a deed of conveyance, etc. And it was mutually covenanted and agreed, that in case default should be made in any of the payments of principal or interest, at the time or any of the times specified for the payment thereof, and for sixty days thereafter, the agreement, and all its provisions, should be null and void, and no longer binding, at the option of the party of the first part, his representatives or assigns, and all the payments which should have been made, absolutely and forever forfeited to the party of the first part; or, at the election of that party, his representatives and assigns, the covenants and liability of the plaintiff in error should remain obligatory upon him, and might be enforced, and the consideration money collected, etc.

It was further agreed, if Russell elected, in default of payments, to declare the contract at an end, and prior payments forfeited, the plaintiff, if in possession, was to be held and deemed the tenant at will of the party of the first part, at a rent equal to an interest of ten per cent. per annum on the whole amount of the purchase money. It was further stipulated, if there was a default in any payments for fifteen days after the same were due and payable, then the whole purchase-money became due and payable.

On this agreement, the plaintiff made the first payment, falling due December 4, 1852, of two hundred dollars, and also other payments some time after they had become due, extending up to September, 1854, since which time no payments appear to have been made.

On the twenty-fifth of March, 1856, the plaintiff was notified in writing, by the agents of Russell, that in consequence of his defaults in his several payments and for sixty days after they were due, and in default of payment of the whole sum due, which became due and payable by the default in the payment of the several installments, and for fifteen days after they were due and payable, Russell had elected to forfeit the contract, and the payments made on it, and to declare the contract null and

void, and he did thereby declare the contract, and the payments made on it, forfeited, and the contract null and void.

Soon after this notice, in the same year, Russell brought his action of ejectment, in the Circuit Court of the United States, against the plaintiff, to recover the possession of the premises, and a verdict and judgment was rendered in favor of Russell; and in July, 1861, after five years litigation, he was put in possession of the premises by the marshal, and now holds them.

In December, 1862, the plaintiff filed his bill in the Circuit Court of Cook county, setting out these facts, and states as the reason why he did not make the payments, due on the original contract for the years 1849, 1850 and 1851, that he "had become involved, through making large improvements upon his property, on the opposite corner to the lot in question, and in consequence of losses in business, and failure to receive payments due, on which he had depended."

He also alleges, as to the agreement of August 2, 1852, that Russell's agents caused him to believe that it was, in all respects, fair and correct, and for fear of losing the benefit of his purchase and the payments already made thereon, "under the pressure of his embarrassed circumstances at the time," he was "induced and prevailed upon by the statements and assurances of Russell's agents, to leave with them the original agreement of 1846, and to sign and receive the agreement of August 2, 1852." The bill also states, when he expressed surprise at the magnitude of the amount due — $7,279.50 — on the assurance of the agents that they had allowed him all credits and payments, and had carefully computed the interest, and that the sum specified was the exact and true sum which would have to be paid on the original contract as modified and extended, and on the assurance, if there was any error, it should be rectified when discovered, and plaintiff in no way prejudiced, he accepted and executed the agreement; and that, on complaining afterwards to the agents and to Russell, of errors in the amount, they agreed and promised, on a final settlement, to make all proper corrections, credits, allowances and abatements. The bill also then goes on to allege, that in good faith, with the

2 — 36 ILL.

purpose and desire of completing the contract, he paid the first "extended" payment of $200, December 4, 1852, and subsequently, at divers times, in separate sums of $200 each, up to and including June 11, 1853, one thousand dollars, and other payments, up to September, 1854, as before stated.

In accounting for the delays in making regular payments, the plaintiff refers to unlooked-for disappointment in receiving payment of his rents and moneys due him in his business, on which he had depended, and to the known liberality of the agents in giving extensions of time, and "showing indulgence to purchasers who might require it — that it was not their practice to take advantage of accidental delays in order to declare a forfeiture, when such delays were not unreasonable or perversely incurred," etc.; and in further explanation of the delay, and as ground of relief, he states that in April, 1854, he "lost by fire his extensive buildings," and his income from the rents thereof, about three thousand dollars a year, on which he had relied when making his arrangements for the completion of the contract and purchase.

The bill further states, that during the temporary absence of plaintiff, his wife, about the 18th of January, 1855, tendered to the agents of Russell four hundred dollars on account, which they refused to receive, they then declaring that they would not receive any further partial payments on the contract, and notified her that they claimed the whole unpaid balance of the purchase-money to be then and at once due, and demanded payment thereof immediately, which was wholly unexpected and a surprise to the plaintiff.

The bill then states, that in consequence of this refusal to receive any more partial payments, plaintiff forbore, and was prevented from making any further payments thereon, until December 1, 1855, when the last payment of seventy-nine and fifty one-hundredths dollars became due, and on that day plaintiff tendered and offered to pay the agents of Russell, at their office during the usual hours of business, the sum of three thousand nine hundred and fifty-one and thirty-five one-hundredths dollars, in full payment of all moneys due and then

remaining unpaid, in gold coin of the United States, and produced and exhibited it, and demanded a deed, which they refused to accept. And the plaintiff further alleges, that at the same time and place he made a tender and offer of payment to these agents of the sum of four thousand four hundred and twenty-six and one one-hundredth dollars, in like gold coin, and which was then and there shown to them, and in readiness to be paid to them, in full payment of all that was due and unpaid on the contract, and which " your orator demanded and asked them " to accept and receive in payment, and give him a deed, all which was refused. That he did not admit that amount was due, but was willing to pay it.

The bill then states, that upon this refusal, he deposited the money in the Commercial Bank of Chicago, then in good credit, to be in readiness for use in making the payment whenever called on, where it remained until, when in the month of March thereafter, one of the agents, in a casual meeting in the street, on the Sabbath day, informed plaintiff that they were instructed by Russell to receive the money on the contract and execute a deed, which the agent said he was ready to do ; that on the next day, Monday, when plaintiff went to the bank to draw his money and make the payment, he was told by the cashier that the bank had that morning stopped payment, and failed that day and proved insolvent. Plaintiff, however, was enabled to get his deposit, after several years, except about seven hundred dollars.

The bill further states, that no lawful or actual demand of payment of the balance of the purchase-money was thereafter made, and that Russell never tendered a deed, etc.

The bill then states the notice, of the 25th March, 1856, of the election of Russell to declare the contract forfeited, and the ejectment suit and proceedings thereon, wherein the bill states, " that upon trial of the suit in ejectment, the presiding judge held, if plaintiff would then pay into court the unpaid balance of the money, he would require Russell to receive it, and to give a deed," but *that* plaintiff, " by reason of the matters aforesaid," was unable to do.

The bill then sets out the proceedings on the judgment against him on the note he had given his attorney to defend the ejectment suit, which it is unnecessary to particularize.

The bill prays that Russell may be compelled to render an account of rents received for the premises since he was put in possession; "that an account of all the matters in the bill stated may be come to;" that it may be declared how much is in equity payable from plaintiff to Russell under the agreement; that the contract of August 2, 1852, may be reformed in respect of any money improperly inserted therein as usurious interest, and other matters, mistakes or errors therein; that the contract may be made to conform to the original instrument, as modified by the agreement for its extension; that all just credits and deductions being made, the plaintiff may be entitled to a specific performance of the agreement, and be relieved from all pretended forfeitures and defaults; and that upon paying what shall be due, on a balance being struck, a deed may be given, executed by the proper parties; that the fraudulent levy and sale may be set aside and canceled; also the sheriff's deed, or that the title sought thereby to be created, may be conveyed to plaintiff, he paying the full amount of sale, interest and costs; and for general relief.

The defendants filed a general demurrer to the bill for want of equity on the face of the bill. This demurrer was sustained and the bill dismissed without prejudice to any right of action the plaintiff might have in the premises against the defendants or either of them. The case is brought here by writ of error, and the ruling of the court is assigned as error.

The first question presented for consideration is, as to the operation and effect of the demurrer. The plaintiff insists, that as it admits the facts charged to be true, the relief prayed for should be granted, those facts presenting equities of the strongest character. We understand, in chancery, a demurrer is always to the merits, and in bar of the relief sought, and proceeds upon the ground that, admitting the facts stated in the bill to be true, the complainant is not entitled to the relief he seeks. It is always founded upon some strong point of law,

going to the absolute denial of the relief sought, but defects in substance are not supplied or aided by it, nor defective statements of title or claims to relief cured by it. The demurrer only admits that which is well stated or pleaded. *Mills et al.* v. *Brown et al.*, 2 Scam. 557; 1 Daniels' Ch. Pr. 601.

It does not admit any matters of law which may be suggested in a bill, or inferred from the facts stated in it. It is not admitted, therefore, by this demurrer, that the contract of August 2, 1852, was an extension of any other previous contract, as contended for by the plaintiff, and on which inference of his own he bases his principal claim to relief. That it is but an extension of the old contract, is a conclusion which the plaintiff has reached, but which is not admitted by the demurrer.

Nor are the general statements, that plaintiff was induced and prevailed upon by the statements and assurances of Russell's agents to leave with them the agreement of 1846, and to sign and receive the agreement of August 2, 1852, admitted, for the reason, no specific fact or facts are charged of an improper character, or unworthy or disreputable means used, to induce the extension of the original contract. Nor is there any fact stated showing errors in the amount of the claim then set up, or the extent of the errors, nor have any errors in computation or otherwise been shown. These allegations are not admitted because they are not well pleaded. Nothing specific or tangible is stated, which could be denied by answer, and nothing is distinctly and unequivocally asserted, demanding denial or answer. There are many of these general and loose statements pervading the bill, which the demurrer does not admit, because they are general, and not specific, and as facts not well pleaded.

The plaintiff insists the August contract was not a new contract, but merely an extension of the contract of 1846. It may not be very material which it is; we are inclined to think, however, from the circumstances attending the transaction, and from the transaction itself, the old contract was thrown aside, and a new one made on a different basis. The first contract had been unperformed, and contained, as we infer, no clause

making time of the essence of the contract, nor did it provide for forfeiture on default. The price to be paid for the lot was greater under the new than under the old contract. It has, too, the most stringent stipulations, and it does not contain the slightest allusion or reference to any prior contract. There is not the least intimation in it that it was designed as a revival, or as an extension of the contract of 1846, for any purpose or for any new consideration. In all its aspects and features, it seems to be an entire new contract for a larger price, and with the stipulation that the covenants to be performed by the plaintiff are expressly made a condition precedent to any performance by Russell, and time is made of the essence of the condition. If it had been intended to revive and extend the old contract, it is natural to suppose, some reference to it, or some intimation to that effect, would be found in the contract actually made. None is found in it; and it seems quite easy to account for the stringent terms embraced in the August contract. The first contract, containing no strong features, had not been complied with. The plaintiff was in arrears nearly three years, and as he states in his bill, had become embarrassed "through making large improvements upon property belonging to himself on the opposite corner to the lot in question," thus misapplying means which should have been punctiliously devoted to the discharge of this contract. He had the means to meet the contract, that is certain, if he had honestly applied them. This neglect to pay, and this diversion of his means to other objects, was an admonition to Russell, if he made another contract with the plaintiff, to avoid embarrassment himself, and to ensure performance, he must introduce into the contract the most stringent provisions; hence the clauses making payment a condition precedent, and time of the essence of the condition.

This contract of August 2, is the last act of the parties, and must be held to contain and express their true meaning and intentions. The old contract has nothing to do with it, but is wholly extinct. The contract is evidenced by this instrument, and by this alone.

Has the plaintiff performed, or offered to perform, his part of this contract? Has he kept the precedent covenants in such manner as to authorize him to call upon the defendant Russell to keep his?

It is an established principle, that a party who seeks a specific performance must show that he has performed, or offered to perform, all the acts which formed the consideration for the undertaking on the part of the defendant. 2 Story's Eq. Juris., sec. 771; *Mason* v. *Richards et al.*, 3 Scam. 25; *Doyle et al.* v. *Teas et al.*, 4 ib. 202; *Jefferson County* v. *Ferguson*, 13 Ill. 33; *Anderson* v. *Frye*, 18 ib. 95; and no rule is better settled than that a party cannot compel the specific performance of a contract in a court of equity, unless he shows that he himself has specifically performed, or can justly account for his non-performance. *Scott* v. *Shepherd*, 3 Gilman, 486.

The contract of August 2, 1852, is the one upon which the rights of the parties depend, and which must be specifically enforced, if any. It supersedes all prior contracts on the subject; all are merged in it. By that contract, the plaintiff agreed to pay the amount specified in it, in monthly installments of two hundred dollars each, commencing on the first day of December, 1852, and ending on the first day of December, 1855, and time is made of the essence of the contract in the strongest terms of which our language is capable, giving Russell a right to declare an absolute forfeiture upon any default of prompt payment.

By the last clause of the contract, it was especially understood and agreed by and between these parties, that in case either of the installments falling due on the first day of December, 1852, and on the first day of each month thereafter, or any part of any such installment or installments, should remain due and unpaid for the space of fifteen days next after the same was due and payable, thereupon the whole sum remaining unpaid was to become due and payable.

What are the facts as admitted?

The first payment was made as stipulated. Other payments were made, not punctually, but, as they were accepted, that was

a waiver of the want of punctuality as to the particular day,
up to the first day of September, 1854. From that time on,
no payments are alleged to have been made, or attempted to be
made, until the eighteenth of January, 1855, at which time the
wife of plaintiff tendered to Russell's agents four hundred
dollars. This sum the agents refused, stating that they should
receive no more partial payments, but claimed the whole unpaid
balance of three thousand eight hundred dollars as then due,
by the terms of the contract, and immediate payment of it was
then demanded. No attention was paid to this, nor were any
further payments made until December, 1855. On the first
day of that month, the plaintiff tendered in gold coin to the
agents of Russell at their office, first the sum of three thousand
nine hundred and fifty-one and thirty-five one-hundredths dol-
lars, and demanded a deed. This being refused, the plaintiff
then, at the same time and place, tendered, in like coin, the sum
of four thousand four hundred and twenty-six and one one-
hundredth dollars, and demanded a deed. The agents declined
to accept the tender of either sum. This money, plaintiff de-
posited in bank, to his own credit, that it might be in readiness
to keep the tender good at any subsequent time.

Some time in March following, one of the agents of Russell
verbally notified the plaintiff, in a casual meeting on the street,
that Russell had directed them to accept the tender and make
the deed, which he was ready to do. To this it does not
appear the plaintiff made any reply.

The next morning, being Monday, the plaintiff went to the
bank to get the money to make the payment, but the bank had
closed its doors that morning, and failed that day. From that
day to this, the plaintiff has not attempted to make the tender
good, and never again did he offer to make any further pay-·
ment, but subsequently withdrew the greater part of his deposit
from the bank, and appropriated it to his own purposes.

This notice was on the eighth day of March, 1856, and no
payment being made, Russell's agents delayed action until
the twenty-sixth of March, eighteen days, and the money not
being forthcoming, the notice of that date was served upon the

plaintiff, that in consequence of his repeated defaults, Russell had declared a forfeiture. Subsequently, Russell brought his action of ejectment, which, after a litigation of five years, terminated in favor of Russell, and he was put in possession, in 1861, of the property by the marshal.

This plain statement of the facts shows, beyond controversy, that the plaintiff has forfeited all rights under this contract by reason of his own *laches* as far back as September, 1854. By the terms of the contract, on the fifteenth of September, the installment payable on the first day of that month, being in arrear for fifteen days, the whole sum became then due. This was an express stipulation of the parties. The plaintiff was in absolute default on all the payments due from the first day of September, 1854, to the eighteenth of January, 1855, when his wife tendered four hundred dollars, and even then grace was offered him, if he would promptly pay the whole amount due, but this was treated with utter indifference up to the first day of December following, when he made his tender.

This tender, it is very clear, the defendant was not bound to accept, and his agents, in refusing it, acted in the exercise of his indisputable right, for the day had gone by — the money was due in September preceding. No court, or well informed lawyer, can, at this day, deny that where by the express stipulations of the parties, as in this case, time is made of the essence of the contract, a court has no right to disregard it. It would be rejecting and annulling an essential part of the express stipulation of the parties, without which, it would not have been entered into. It is a familiar maxim, that it is the duty of the courts to give effect to existing contracts, not to make new ones for parties. *Wynkoop* v. *Cowing*, 21 Ill. 570; *Steele et al.* v. *Biggs et al.*, 22 ib. 643. Parties have a right to make the time of the performance of a contract material, and a court of equity has no power to enforce its specific performance contrary to the clearly expressed intention of the parties. *Kemp* v. *Humphreys*, 13 ib. 577.

But admitting all the plaintiff's rights remained unaffected under the contract up to the first day of December, 1855, when

he made his tender, and that it was the duty of Russell to have accepted it, and made the conveyance, it was the duty of the plaintiff to have kept the money safely, and be ready to pay it over when the defendant should consent to accept it. *Knox et al.* v. *Light et al.*, 12 Ill. 86. A debtor is bound at all times to be prepared to meet a demand for money that he may have tendered. *Town* v. *Trow*, 24 Pickering, 171.

If a creditor refuses money tendered by a person having the right to make the tender, interest will cease to run from the time of the tender, especially if the debtor keeps the money continually ready, and makes no profit by it. *Gyles* v. *Hall*, 2 Peere Wms. 378.

The plaintiff did not do this, but when notified by the agent of Russell, that he was instructed to receive the money and was ready to receive it and make a deed, the plaintiff failed to produce it, he had used it up — it was not forthcoming. Some portion of the plaintiff's argument on this point, would seem to imply that when he had once tendered the money and it was refused, all further responsibility in relation thereto was at an end, and that he had a right to throw it away, or use it for his own purposes. It was his duty to keep the money safely, and produce it when required, to keep his tender good, and especially not to appropriate it to his own use, which he seems to have done, so fast as he collected it from the bank.

By this conduct he again placed himself in default after the tender, and lost all benefit to which he might have been otherwise entitled by reason of the tender. We have rarely met with a case exhibiting such repeated and gross *laches* on the part of a purchaser even when time is not especially made important by the terms of the contract, and we are by no means prepared to say that we could overlook these repeated instances of *laches*, were such the character of this contract. But when we consider the character of the stipulations in this case, which must control the rights of the parties, and which we are bound to enforce, it seems to us extraordinary that the party should come here, and ask so confidently as he has done, that we should relieve him from the legitimate consequences of his neglect. Again,

the bill shows, that the ejectment suit was in litigation five years, during which time no effort was made by the plaintiff to pay the money, and even when a verdict was rendered against him, the distinguished judge presiding, advised him, if he would then pay the money, he would withhold judgment, and order a conveyance.

It is in vain to urge, in view of the facts appearing on the record, as reasons for the non-payment of the money, losses in business, and deprivation of rents occasioned by burning of buildings, which we understand were on the lot "on the opposite corner to the lot in question," and which the plaintiff had rented for three thousand dollars a year. These are not legitimate excuses in any court. A tenant is bound to pay the stipulated rent, though the building is consumed by fire, and on such valuable property as this is, the money due on the contract could be raised any day on mortgage, but not an effort was made to raise it for months after the whole amount had become due, or after he was notified on the eighth of March, 1856, that his tender would be accepted. And when the judge advised him, if he would bring the money into court, he would withhold judgment, why did he not then raise the money by mortgage, which could have been so easily done?

The bill itself shows the plaintiff is not entitled to a decree on the grounds we have stated.

In our former adjudication of this case, we placed our decision mainly on the ground of the conclusive character of the verdict and judgment in the ejectment, and the neglect of the plaintiff, in not making his defense, so far as it was a legal defense, in that suit. We are still inclined to that opinion. Not one of the cases cited for the plaintiff resembles this case in its most important and distinguishing features. In this case, the possession by the defendant was *prima facie* a lawful possession, and by the very terms of the contract, he was the tenant of Russell, paying a stipulated rent. He was in under a contract, which he might show, in order to protect his possession, he had performed. To this extent is the case of *Sloan* v. *Petrie,* decided by this court, 16th Ill. 262. That was an action of ejectment,

and the defense was a contract for the purchase of the premises by the defendant, under which the defendant took possession and claimed to hold them. The case turned on the validity of the tender of the purchase-money, and a verdict was found for the defendant and judgment for him. On appeal, the judgment was reversed, on the ground of insufficiency of proof of the tender. In this case it is nowhere intimated by court or counsel, that the defense, if made out, was not a good legal defense. The court, CATON, J., delivering the opinion, says : The principal question in the case is, whether the purchaser performed on his part, so as to entitle him to the benefit of the contract, and to retain possession under it, or whether he has forfeited the benefits of his contract by non-performance. Here is a clear admission that the defense was a valid one, if established.

We can perceive no good reason why proof of the contract, taking possession, making valuable improvements, paying the taxes, and exercising every imaginable act of ownership over the property, and paying the amount contracted to be paid for it, or tendering the amount at the proper time, should not amount to a legal defense to an action of ejectment. That action proceeds for the possession of the premises, claiming that they have been unlawfully entered into and unjustly withheld. Facts which go to disprove these make a legal defense, but in this case, the bill itself shows the plaintiff is not entitled to a decree upon the grounds we have stated, independent of the judgment in ejectment.

We can see nothing in the plaintiff's case entitling it to the favorable consideration of this court.

It is true, as a general principle in equity, time is not material. But where it is so stipulated, in language strong and unambiguous, as in this contract, such stipulation is as much a part of the contract as any other stipulation in it, and no court has ever exercised the power of dispensing with it. We do not think a well considered case can be found, where the parties, by their own express contract, have made time of the essence, in which a court has ignored it. It was incumbent on the plaintiff to show performance on his part according to the contract,

or that he was prevented by some unauthorized act of Russell. This he has failed to do. By his own voluntary agreement, he made the payment of the purchase-money a condition precedent and time of the essence of the condition, and he has no right to complain that the vendor has taken him at his word.

We had occasion, in the case of *Steele et al.* v. *Biggs et al.*, 22 Ill. 652, above cited, to examine this doctrine at some length, and in the opinion approving, reference was made to the opinion of Baron ALDERSON, in the case of *Hipwell* v. *Knight*, 1 Younge & Collier (Exchq.) 415. He said: "I do not see, therefore, if the parties choose, even arbitrarily, provided both of them intend so to do, to stipulate for a particular thing to be done at a particular time, such a stipulation is not to be carried literally into effect in a court of equity. This is the real contract. The parties had a right to make it. Why, then, should a court of equity interfere, to make a new contract, which the parties have not made nor consented to?"

Inevitable accidents might, perhaps, be ground for relief even in such case, but nothing of that kind is shown here, but a series of delays, unaccounted for, and unjustifiable. He has not shown himself "ready, desirous, prompt and eager" to perform.

The notion that seems too much to prevail, to use the language of Lord LOUGHBOROUGH, in the case of *Lloyd* v. *Collett*, 4 Bro. 469, that a party may be utterly regardless of his stipulated payments, and that a court of chancery will, almost at any time, relieve him from the penalty of his gross negligence, is very injurious to good morals, to a lively sense of obligation, to the sanctity of contracts, and to the character of a court of equity. It would be, he says, against all his impressions of the principles of equity, to help those who show no equitable title to relief.

The rule, that a specific performance will not be compelled, in equity, when the party has omitted to execute his part of the contract, by the time appointed, without assigning any sufficient justification or excuse for his delay, and when there is nothing in the acts or conduct of the other party that

amounts to an acquiescence in that delay, is, this distinguished chancellor says, founded in the soundest principles of policy and justice, and its tendency is to uphold good faith and punctuality in dealing.

In this, we entirely concur.

It may have been of vital importance to Russell, for aught we know, to have a prompt performance of this contract, and to hold the plaintiff to a strict performance of its stipulations. He may have been under similar responsibilities and stipulations. But, be that as it may, the plaintiff was bound to perform his contract to the letter. He did not do so, and can therefore have no standing in this court, no circumstances being shown to ameliorate the consequences of his default.

As to the seizure and sale of this lot, under the execution of Coventry, it cannot matter how irregular the proceedings may have been, for the reason that the plaintiff had forfeited all right to it. He should not complain if the property of another person has been sold to discharge his own debt.

We fail to perceive any equity in this bill, and affirm the judgment sustaining the demurrer to it, and dismissing the bill. There was no error in either.

*Decree affirmed.*